**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

United States of America,

        Plaintiff,

v.

Amber Ortega,

        Defendant.

No. 20-MJ-08904M-LAB

**ORDER**

      Pending before the court is the government's motion in limine to preclude any defense under the Religious Freedom Restoration Act (RFRA).  (Doc. 32)  The motion will be granted in part and denied in part. The defense was unable to prove at trial that the government imposed a "substantial burden" on the defendant's exercise of her religion. The testimony of expert witness Lorraine Eiler will not be considered in the Court's determination of guilt or innocence, but the Court may consider it for purposes of motive and mitigation.

      On 9/9/20 the defendant, Amber Ortega, was arrested in Organ Pipe Cactus National Monument. The next day, she was charged by complaint with interfering with agency function and violating a closure order, in violation of 36 C.F.R. §§ 2.32(a)(2) and 1.5. The case was subsequently scheduled for a bench trial on 11/4/21.

      On 8/26/21 the government filed the pending motion in limine to preclude any defense under the Religious Freedom Restoration Act (RFRA). (Doc. 32) The defendant did not file a response but filed a Notice of Defenses on 8/27/21, stating that Ms. Ortega

felt compelled to take the actions that resulted in her arrest, based on a sincerely held religious belief. The notice listed an expert witness whom the defense intended to call at trial. In its trial brief, the government argued that the proposed expert witness's testimony would be irrelevant and any testimony regarding the religious nature of the closed area would be improper. (Doc. 35) In her trial brief, the defendant posited that the exercise of her sincerely held religious beliefs was substantially burdened by the law she is accused of violating.

At trial, Park Ranger Andrew Kois testified for the government. Government's exhibits 2, 3 and 10 were admitted without objection. The defense called Lorraine Eiler as an expert witness, over the objection of the government. The Court took the objection under advisement. The defendant then testified on her own behalf. The government objected to the portion of her testimony related to the RFRA defense, based on relevance.

For the reasons stated below, the Court finds that RFRA applies in the present case, but the defense was unable to prove that the government imposed a "substantial burden" on the defendant's exercise of her religion. The testimony of Lorraine Eiler and the defendant's testimony regarding RFRA will be admitted and considered by the Court for motive and mitigation only.

**Evidence**:

**Andrew Kois** testified that he is a United States park ranger employed by the National Park Service, primarily working in law enforcement in Organ Pipe Cactus National Monument. He has been a park ranger since April 2012. (RT p. 17, ln. 18; p. 18, lns. 6-7, 11) Ranger Kois identified exhibit 2 as a map of the southern portion of Organ Pipe Cactus National Monument. (RT p. 19, lns. 8-11) He identified exhibit 3 as a closure order issued by the superintendent, dated 10/9/19. (RT p. 20, lns. 1, 5, 8-9)

The areas on exhibit 2 shown in orange were the closed areas. (Id. at lns. 23-25) The closure order was in effect on 9/9/20. (RT p. 21, lns. 9-12) The closure occurred due to a construction project at the international boundary which involved a lot of heavy machinery and construction equipment. (Id. at lns. 12-15) The order was intended to

1   protect the safety of the public. (Id. at lns. 17-18) There was a sign posted at Crossover
2   Road between South Puerto Blanco and the West Border Road, announcing the closure
3   area. (RT p. 30, lns. 2-3) The sign was a couple hundred feet from where Ms. Ortega was
4   encountered, and she would have had to pass it to get to her location. (Id. at lns. 5-7)

5       Ranger Kois was on duty on 9/9/20. (RT p. 22, lns. 15-16) He responded to an
6   area near West Border Road at the request of U.S. Border Patrol agents. (Id. at lns. 17-19,
7   21-22) The agents had observed four people in the area and their presence caused
8   construction to cease. (Id. at lns. 22-25, p. 23, ln. 1)   The defendant was one of the
9   people. (RT p. 23, lns. 3-4)

10       Ranger Kois and his partner Ranger Good Shield approached Ms. Ortega and told
11   her several times that the area was closed and that she needed to leave. (RT p. 24, lns.6-9)
12   Ms. Ortega was "screaming and shouting over me." (Id. at lns. 9-10) She refused to leave.
13   (Id. at lns. 19-20) Ms. Ortega told Ranger Kois that the land was not the government's,
14   that it was stolen, and the land was being raped. (Id. at lns.22-23) Ranger Kois told Ms.
15   Ortega that if she did not leave, he would have to arrest her, which he did. (RT p. 25, lns.
16   1-5) Ms. Ortega's actions prevented construction work from continuing. (RT p. 30, lns.
17   20-22) She was standing in front of a water tender truck. (Id. at lns. 24-25)

18       On cross examination, Ranger Kois testified that he heard Ms. Ortega singing and
19   chanting. (RT p. 27, lns. 22-24) He is aware that Quitobaquito Springs is sacred to the
20   native people. (RT p. 28, lns. 12-14) The construction work was occurring about an
21   eighth of a mile or farther from the springs. (Id. at lns. 6-9)

22       **Lorraine Eiler** testified that she is a member of the Tohono O'odham Nation and
23   is a Hia Ced O'odham. (RT p. 33, lns. 19-21) Since the 80's she has held a number of
24   positions within tribal government. (RT p. 34, lns. 4-8) She also has experience with
25   environmental issues in southern Arizona. (Id. at lns. 9-11) Ms. Eiler is knowledgeable
26   about the Quitobaquito Springs area because it was her great-grandparents' home and she
27   spends time there cleaning up the cemetery and for ceremonies. (RT p. 36, lns. 1, 9-12)
28   The spring and surrounding area hold religious significance for indigenous people. (Id. at

lns. 13-16) O'odham people come from all over to get water from the spring to use for their prayers, much like Catholics use holy water for their prayers. (RT p. 40, lns. 5-8)

Although the government objected to Ms. Eiler's testimony based on relevance, it did not object to her being designated an expert witness.

Ms. Eiler explained that Quitobaquito Springs is an important religious and cultural area for the O'odham people. (RT 38, lns. 1-5) She testified that the staff at Organ Pipe National Monument is aware of the religious significance because a number of ceremonies were held there last year. (Id. at lns. 5-6) The ceremonies included the spiritual runners who camp at Quitobaquito before they cross from reservations in Arizona on their way to the Salt Flats on the Sea of Cortez in Mexico. (Id. at lns. 7-13) That ritual stopped because of the border wall. (Id. at lns. 13-14)

In 2020 there was access to the sacred area through an application process. (Id. at lns. 17-19, 20-21) Previously, tribal members were not allowed in because of the work that was going on, but after they protested, the work stopped, and tribal members were given access to the area. (RT pp. 38-39, lns. 23-25, 1) The tribe is now working with Organ Pipe to repair the spring area. (RT p. 39, lns. 6-8) When it was bulldozed, a lot of damage was caused, resulting in the loss of medicinal plants. (Id. at lns. 20-22) Also, the water level went down. (RT p. 41, lns. 20-22)

Quitobaquito still holds religious significance. (RT p. 42, lns. 9-11) The water has built up again. (Id. at ln. 13) Since the October 2019 closure order, Ms. Eiler has been able to go to the area because the National Park Service has cooperated in allowing people access to Quitobaquito. (Id. at lns.14-19) To her knowledge, none of the organizations Ms. Eiler is associated with have filed lawsuits to prevent construction of the border wall. (RT p. 43, lns. 7-15)

**Amber Ortega** testified that she has lived in Arizona her entire life and is a member of the Tohono O'odham Nation and a descendant of Hia Ced O'odham. (RT p. 44, lns.23-24; p. 45, lns. 2-3) On 9/9/20, Ms. Ortega was in the area of Quitobaquito Springs. (RT p. 45, lns. 7-9) The spring is spiritual and part of her people's survival. (Id.

at lns. 12-13) "It holds healing and strength for our people and has since time immemorial." (Id. at lns. 14-16) It's where her relatives come from. (Id. at lns. 18-19)

Prior to the border wall construction, Ms. Ortega and others made frequent trips to Quitobaquito for ceremonies, to camp, pray and run. (RT pp. 45-46, lns. 25, 1-4) Now she asks for guidance regarding the destruction in the area of the spring.  Id. On 9/9/20 Ms. Ortega went to the spring and did what she always does when she visits. She walked the pond four times then went to the bottom of the mountain where the water comes out, to sit and sing and pray to Thanathacum, the creator. (RT p. 46, lns. 15-20) She was praying for what was happening, including record low water levels. (RT p. 47, lns. 12-14) Damage from the construction was visible. (RT p. 48, lns. 2-4) Also environmental groups were monitoring the border wall construction, and they were providing the public with information on the environmental impact of the border wall construction. (Id. at lns. 15-17)

While Ms. Ortega was praying, she heard the sound of heavy equipment coming from the parking area in front of Quitobaquito Springs. (RT p. 49, lns. 6-8, 11-12) She ran to the parking lot where she met Nellie Jo David. (Id. at ln. 13) They knew they "needed to protect the land from being desecrated without cultural monitors present." (Id. at lns. 14-16) There were vehicles parked on both sides of the road and one vehicle was preparing to cut through the land. (RT p. 50, lns. 7-8) That offended Ms. Ortega's religious beliefs and "felt like a continuation of the harms done to our people, without regard to who we are and what we believe in." (Id. at lns. 9-15) Ms. Ortega and Nellie Jo positioned themselves to make it impossible for the land to be hurt or damaged. (Id. at lns. 19-20) They asked the driver to stop the construction vehicle. (Id. at lns. 23-24) Then Ms. Ortega began to sing to honor the land, the water, her creator and her people. (RT pp. 50-51, lns. 24-25, 1-2) She had not seen any signs designating the area as closed. (RT p. 51, lns. 22-24)

Border Patrol agents and Park Service officers shouted at Ms. Ortega as she sang. (RT p. 52, lns. 3-4, 9-10) She explained to them that she is Tohono O'odham and Hia

1   Ced O'odham and told them what the land means to her people. (Id. at lns.19-22) She

2   was triggered, intimidated and scared. (RT p. 53, lns. 16-18)

3       The officers kept telling Ms. Ortega that there was a closure order and that she

4   could leave, though Nellie Jo David had already been arrested. (RT p. 54, lns. 2-5) Ms.

5   Ortega told them that she did not feel safe leaving and wanted them to take their

6   machines and guns away. (Id. at lns. 6-7) The ranger told her that if she did not leave, she

7   would be arrested. (RT p. 60, lns. 22-23) The agents and rangers moved in slowly and

8   arrested Ms. Ortega. (Id. at lns. 9-10) She was present that day based on her sincerely

9   held religious beliefs. (RT p. 63, lns. 11-13)

10      On cross examination, Ms. Ortega acknowledged that on the date she was arrested

11  there was no government interference with her ability to pray at Quitobaquito. (RT p. 60,

12  lns. 10-13)

13  **DISCUSSION**

14      The government explained that it does not doubt the sincerity of the defendant's

15  religious beliefs nor that they are deeply held. (RT p. 74, lns. 2-5) The evidence showed

16  that Ms. Ortega went to Quitobaquito Springs on 9/9/20 to pray and engage in religious

17  practices, as she and her ancestors have done for many years. The government proved

18  that the sacred place, Quitobaquito Springs, was not subject to the closure order and the

19  defendant had access to her spiritual site. (Id. at lns. 6-7) The conduct in question is

20  limited to the defendant's presence in the closed area where she is accused of interfering

21  with the activities of the border wall construction equipment. No one asked her to

22  discontinue her prayers or to leave the sacred springs where she was engaged in the

23  practice of her religion. The government also pointed out that neither Ms. Ortega nor any

24  other member of the tribe filed a lawsuit or filed for injunctive relief to stop the

25  destruction of the land near the springs.

26      The defendant admitted that when she ran to the parking lot, she was told by

27  Ranger Kois that she was in a closed area. She knew he was a federal agent. Ms. Ortega

28  agreed that Ranger Kois offered her the opportunity to leave the area or stay and be

arrested. She explained that she did not feel safe leaving because she was concerned about the desecration of the land and because there were agents and guns present. She tried to explain why she was there and what the land means to her people.

The Religious Freedom Restoration Act (RFRA) was passed by Congress in 1993 and was codified in 42 U.S.C. § 2000bb, to reinstate the strict scrutiny test found in the earlier cases of *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). RFRA mandates a strict scrutiny standard when determining if there is a violation of the Free Exercise Clause of the First Amendment. RFRA provides "greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). A defendant may raise RFRA as a defense in a criminal case where the government charges her for engaging in activities that are prohibited by law but form part of her religious exercise. *U.S. v. Christie*, 825 F.3d 1048, 1055 (9th Cir. 2016).

A person presenting a RFRA defense must first demonstrate that she holds a belief that is religious in nature and that the belief is sincerely held.  Those two factors are not in dispute in this case because the government conceded them and they were proven through the testimony of the defendant and Lorraine Eiler. The issue for this Court is whether the defendant can establish a *prima facie* case by showing that forcing her to obey the law would "impose a substantial burden on [her] ability to conduct [herself] in accordance with those sincerely held religious beliefs." *Id.*

The government explains that the defendant must show how her presence in the closed area and her disruption of the construction project was an exercise of her sincerely held religious beliefs. She would have to prove that the laws she is accused of violating placed a substantial burden on her religious observance. The government relies on the Ninth Circuit's holding in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir., 2008) for the proposition that a defendant can only show a substantial burden on the exercise of her religion if she is coerced to act contrary to her religious beliefs under the threat of sanctions, or if a government benefit is conditioned on conduct that would

violate her religious beliefs. While it appears that the government correctly states the holding in *Navajo Nation*, one could argue that the two alternate methods discussed in that case are illustrative and not mandatory. It is instructive to consider the dissenting opinion which was written by Judge William Fletcher and joined by Judges Pregerson and Fisher.

In that dissent, Fletcher opined that the purpose of RFRA was to restore the compelling interest test from *Sherbert* and *Yoder* "and to guarantee its application in all cases where free exercise of religion is substantially burdened." *Id*. at 1086. Judge Fletcher explained that the majority erred in concluding that *Sherbert* and *Yoder* provide an exhaustive definition of "substantial burden" because that test is much too restrictive. *Id*. He reasoned that the restrictive definition is inconsistent with the plain meaning of the phrase. RFRA does not explicitly incorporate any pre-RFRA definition of "substantial burden." In *Sherbert* and *Yoder* the Supreme Court did not hold that only through the two mechanisms in those cases could there be a substantial burden on the exercise of one's religion.  RFRA was enacted to expand the protection for the exercise of religion, not restrict it.  This court need not address this issue, however, because even assuming a more expansive definition of "substantial burden," Ms. Ortega's defense fails.

The laws under which Ms. Ortega was charged required only that she not enter a limited area of Organ Pipe National Monument that was temporarily closed, and that she obey the lawful order of Ranger Kois, a government agent who was authorized to control public access and movement where control of public movement was necessary to maintain public safety. The closure order was temporary and had been in effect for eleven months prior to the defendant's arrest. The order specifically states that the closure was implemented to protect the public from exposure to heavy machinery and construction activities.

Uncontroverted testimony from both Ms. Ortega and Ms. Eiler established that Ms. Ortega, and other tribal members, had access to the sacred Quitobaquito Springs, even during the closure period. Ms. Eiler explained that during 2020, the government

allowed tribal members access to their spiritual site through a permit process. Even when construction was in progress, the workers would stop their work to allow tribal members to pass through. Both witnesses explained that the water from the spring was used in their spiritual ceremonies and although the water level dropped at times, they had access to the water and levels are returning to normal. Ms. Eiler testified that the tribe is working with Organ Pipe to repair the spring areas with Indian-based contractors who are restoring the area to bring it back to what it used to be.

There was no evidence presented that proved that the government interfered with Ms. Ortega's prayers or ceremony at Quitobaquito Springs on 9/9/20, other than the distant sound of the heavy machinery. Ms. Ortega left the springs where she was praying and entered the closed construction area. The park rangers advised Ms. Ortega that the area under construction was closed to the public and she was instructed to leave, or she would be arrested.

Ms. Ortega was disturbed by the destruction and desecration of the land near the springs. She was spiritually wounded by the knowledge that the border wall was going to interrupt access of tribal members to their ancestral lands and that important medicinal plants would be destroyed. Construction of the border wall raised painful memories of the harms suffered by native people at the hands of the government throughout history. Ms. Ortega's testimony was emotional and heartfelt. There is no question that her suffering is genuine and is rooted in her sincerely held religious beliefs. However, the defense was unable to prove that on 9/9/20 the closure order and the ranger's lawful order that Ms. Ortega leave the construction zone imposed a substantial burden on her ability to engage in her religious activities.

**<u>CONCLUSION</u>**

For the reasons discussed above, the motion in limine is granted in part and denied in part. The testimony of Lorraine Eiler will not be considered in the Court's determination of guilt or innocence, although the Court may consider it for purposes of motive and mitigation. The portions of Ms. Ortega's testimony that were elicited strictly

to support the RFRA defense may also be relied upon for motive and mitigation.

The government asked the Court to stay any determination of guilt or innocence if the court allowed evidence of the RFRA defense to be admitted. The Court will stay the verdict in this case for 30 days and will issue a verdict on 12/15/21, unless the parties agree otherwise.

DATED this 15th day of November 2021.

Honorable Leslie A. Bowman
United States Magistrate Judge