1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Amy P. Knight, Bar # 031374
KNIGHT LAW FIRM, PC
3849 E Broadway Blvd #288
Tucson, AZ 85716
(520) 878-8849
amy@amyknightlaw.com

Attorney for Defendant Amber Ortega

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

United States of America,
      Plaintiff,

vs.

AMBER ORTEGA,
      Defendant.

)
)
)
)
)
)
)
)
)
)
)

No. 20-mj-08904-N/A-LAB

**MOTION TO RECONSIDER ORDER
REJECTING RFRA DEFENSE**

Defendant Amber Ortega, through counsel undersigned, hereby moves this Court to reconsider its November 18, 2021 Order (Doc. 46) that testimony regarding RFRA will not be admitted and considered on the question of guilt or innocence.

Local Rule of Criminal Procedure 12.1, addressing motions in criminal cases, incorporates the provisions of Rule 7.2 of the Local Rules of Civil Procedure, which addresses motions for reconsideration in subsection (g). This rule requires the movant to "point out with specificity the matters that the movant believes were overlooked or

misapprehended by the Court, or any new matters being brought to the Court's attention for the first time and the reasons they were not presented earlier." The rule also contemplates the filing within fourteen days of the filing of the Order that is the subject of the motion, although that date may be excused on a showing of good cause. Here, the Order was entered 20 days ago, but good cause exists for this very brief delay because defendant was in the process of obtaining new counsel (a process made more difficult and time-consuming by the ongoing COVID-19 pandemic), because the issues are complex and benefit from careful research, and because the fourteen days since the issuance of the order included the Thanksgiving holiday. Because the Court has already agreed to delay its verdict at the government's request until December 15, the filing of this motion now will not cause prejudice.

The application of the Religious Freedom Restoration Act (RFRA) is complex, and often fact-specific. There is a significant body of law interpreting each of its requirements. This Court was provided with very little briefing on the subject, and did not identify and correctly apply the governing law. Resolving that now, before a verdict or judgment, will conserve resources and be preferable to addressing it in a motion for new trial or appeal to the District Court.

The Order contains three significant errors. First, it applies the RFRA analysis to the wrong government action. Second, it badly misapprehends the nature and scope of the exercise of religion being asserted. Third, it misunderstands RFRA's "substantial burden" requirement.

### A.  Government Action

This Court's Order concludes that "the defense was unable to prove that on 9/9/20 the closure order and the ranger's lawful order that Ms. Ortega leave the construction zone imposed a substantial burden on her ability to engage in her religious activities." Doc. 46 at 9. That is the wrong question. This is not a civil lawsuit seeking to void a closure order. Ms. Ortega did not initiate these proceedings; the government did. And it is that action—the criminal prosecution and any concomitant punishment, not the closure order—that imposes the relevant substantial burden on her exercise of religion.

It is far beyond the scope of this misdemeanor prosecution to determine whether the government may undertake this construction or close a particular area. This is in stark contrast to a case like *Navajo Nation v. U.S. Forest Service,* 535 U.S. 1068 (9th Cir. 2008), in which plaintiffs asked the court to prohibit the government from proceeding with a particular aspect of its development of government-owned land. There, the question was whether the government could use artificial snow made in small part from recycled wastewater on federal land over the objection of a tribe for whom that action desecrated religiously significant land. The equivalent here would be if Ms. Ortega had sued to enjoin the construction of the wall, because it offended her religious beliefs. She has done no such thing. She asks only that she not be imprisoned, restricted in her liberty, or fined by the government for vocally and physically objecting to that construction—actions very much encompassed in her religion, as explained in more detail below.[1] Whether Ms. Ortega was

---

[1] This is not to say that any individual has a right to physically interfere with government actions that offend their religious beliefs. There is a crucial difference between seeking to

able to engage in prayer at a particular sacred site with the construction ongoing nearby addresses the effect of the *construction* on her exercise of religion. This Court should instead assess whether criminal prosecution for the particular actions she is accused of taking—entering the area and refusing to leave—substantially burdens her religious exercise. And if those particular actions were a part of her religious exercise, then it obviously does.

The government accomplished its goal—it was able to remove her from the area and continue with the construction to which she was objecting. And, absent this prosecution, Ms. Ortega was able to engage in the relevant exercise of her religion: doing whatever she could to protect her people's sacred lands, including placing her own body between the equipment she viewed as harmful and the land she viewed as sacred. Prosecuting her now for those religiously motivated actions accomplishes nothing, let alone a compelling government interest that can be accomplished no other way. And it is the validity of the prosecution, not the legality of the construction project, that this Court must decide.

In short, because this is a criminal prosecution of Ms. Ortega, the emphasis must be on the religious nature of the actions taken by Ms. Ortega. This Court's RFRA analysis did not evaluate her actions; it evaluated the government's program. That is a manifest error.

**B. Exercise of Religion**

RFRA, 42 U.S.C.A. § 2000bb-1, forbids the imposition of a substantial burden on "a person's exercise of religion." In ruling that Ms. Ortega had not established a prima facie case, this Court explained that "Ms. Ortega, and other tribal members, had access to the

---

interfere in a third party's actions that are, according to one's religion, wrong, and engaging in a centuries-old spiritual practice of resisting and bearing witness to actions that directly and immediately disrupt a person's own religious life.

sacred Quitobaquito Springs, even during the closure period," and that "although the water level dropped at times, they had access to the water and levels are returning to normal." Doc. 46 at 8-9. It went on to state "[t]here was no evidence presented that proved that the government interfered with Ms. Ortega's prayers or ceremony at Quitobaquito Springs on 9/9/20, other than the distant sound of heavy machinery." *Id.* at 9. Thus, the "exercise of religion" this Court considered, and based its ruling on, consisted solely of ability to physically access a particular sacred site. That is far too narrow an understanding of the religious actions at issue here, and limiting consideration to only physical access to a very specific sacred site fails to afford Ms. Ortega the protection Congress intended to afford her when it enacted RFRA. The Court should not contribute to the development of a body of RFRA law biased toward activities easily recognizable to European-descended Americans as prayer. RFRA quite plainly encompasses not only acts of explicit worship, prayer, or ceremony, but actions that form a part of a religion's teachings. *See, e.g., Fifth Ave. Presbyterian Church v. City of N.Y.*, 293 F.3d 570, 574–75 (2d Cir. 2002) (church's "provision of outdoor sleeping space for the homeless effectuates a sincerely held religious belief" under free exercise clause[2]). And the Supreme Court has directed that religion must be understood in light of "the richness and variety of spiritual life in our country." *United States v. Seeger,* 380 U.S. 163, 185 (1965).

---

[2] The Ninth Circuit and this district have repeatedly defined the concept of "religion" in RFRA and the related statute RLUIPA according to its jurisprudence in the constitutional Free Exercise context. *United States v. Zimmerman*, 514 F.3d 851, 853–54 (9th Cir. 2007) (importing definition of religion in a Free Exercise case, Callahan, into the context of RFRA); see also *Isbell v. Ryan*, 2011 WL 6050337, at *5 (D. Ariz. Dec. 6, 2011); *Guillen v. Thompson*, 2008 WL 5331915, at *3 (D. Ariz. Dec. 19, 2008).

First, the Court simply cannot assume that religious practices at a ceremonial site can occur without substantial burden simply because there is physical access. The physical desecration of the surrounding area, the presence of heavy machinery, and the erection of an enormous wall on sacred lands fundamentally disrupt the spiritual experiences Ms. Ortega has in those places, even if she is physically able to access a particular sacred site. Ms. Ortega's religion places great importance on the natural world and the relationship between people and the land on which they exist. Visibly and audibly disrupting that land has a devastating impact on the ability to engage in that sacred communion whether or not Ms. Ortega could physically put her feet at one particular sacred site. Perhaps in some religions, physical access to a sacred site is what is really necessary for the particular exercise of religion. But Ms. Ortega's religion simply does not work that way, and to blindly assume that it does is to discount the nature of the religion itself.[3]

But perhaps more to the point, the Court's analysis ignores entirely the inescapable fact that the act of defending the land is itself an exercise of religion. Ms. Ortega's actions here, as summarized by this Court, included placing her body in front of a construction vehicle and verbally telling Rangers that the land was stolen and was being raped, while insisting she needed to remain there to seek to prevent those things. Doc. 46 at 3. She was singing

---

[3] The disruption occurring here is of an entirely different nature than that considered in *Navajo Nation.* The physical destruction and division of the land with heavy machinery within, as estimated by the government's witness, approximately one eighth of a mile of a sacred site, which is both visible and audible and does undeniable damage to the land, does far more than simply "decrease the spiritual fulfillment" of "practicing their religion" in the area. 535 F.3d. at 1063.

and chanting while she did this. *Id.* These are the actions for which she is being prosecuted, and for which she claims RFRA's protection. Especially in light of the history of interactions among people living on and later arriving on this continent, the act of defending sacred ancestral lands (in addition to spiritual activities that occur on those lands) is very much a part of the religious practice of many O'odham people, including Ms. Ortega. Regardless of whether she has any legal entitlement to actually stop the construction, she absolutely has a legal entitlement to engage in her religious practice of expressing her resistance to the desecration of her sacred ancestral lands and seeking to protect them—even if those efforts must ultimately prove unsuccessful. The fact that those acts were against the law does not change their fundamentally religious nature; indeed, it is that very fact that necessitates a statute like RFRA to begin with. RFRA, in the criminal context, *assumes* that certain actions that are against the law may be exercises of religion, and thus not subject to prosecution, unlawfulness notwithstanding. Even assuming (without conceding) that the government had some right to ultimately remove her from the area, it has *no* right to bring criminal charges against her for doing what her religion calls for. This Court's failure to acknowledge these aspects of Ms. Ortega's exercise of religion constitutes a manifest error warranting reconsideration of the November 18, 2021 Order.

## C. Substantial Burden

This Court recognized that *Navajo Nation* provides some discussion of the "substantial burden" analysis, and then declined to rule one way or the other on whether the two methods discussed there were the only possible methods for establishing a substantial burden. Doc. 46 at 8. The Court never says what the "more expansive definition" under

which the claim also fails might be, ruling only that because Ms. Ortega had physical access to one particular sacred site, there was no substantial burden. *Id.* But a proper analysis of this prong involves identifying the governing standard and applying it to the actual full exercise of religion at issue here, as identified above.

Courts in this district have interpreted and applied RFRA's requirements recently. In *United States v. Hoffman,* 436 F.Supp.3d 1271 (D. Ariz. 2020), the Court explained:

> Defendants, do not need to show that their beliefs "required" them to conduct their religiously motivated activities . . . in order to succeed on their RFRA claim. (*Id.*) As amended, RFRA protects "*any* exercise of religion, *whether or not compelled by, or central to,* a system of religious belief." § 2000cc-5(7)(A) (emphasis added). "[A] burden can be 'substantial' even if it does not compel or order the claimant to betray a sincerely held belief[.]" Accordingly, Defendants need not establish that their beliefs "required" them to enter the [restricted federal lands]. Rather, Defendants must only show that enforcement of the regulations against them causes them "considerable pressure" to abandon *any* exercise of religion.

*Id.* at 1286 (internal citations omitted).

As this Court has already recognized, *Navajo Nation* did not purport to set out the only possible methods of proving a substantial burden, and indeed, because that case arose in the context of an affirmative lawsuit seeking to enjoin the government's own actions on its land, rather than as a defense to a criminal prosecution, the precise contours of its analysis are of little use here. This Court should recognize, as the *Hoffman* Court did, that the "substantial burden" prohibition prevents the government from criminally prosecuting anyone for actions that constitute the exercise of a sincerely held religious belief—which is entirely compatible with the Ninth Circuit's *Navajo Nation* opinion. Here, there is no question that in protesting the desecration of the land and seeking to protect her ancestral

homeland, Ms. Ortega was acting in exercise of her religious beliefs. Prosecuting her for those actions is *per se* a substantial burden. *Cf. Wisconsin v. Yoder,* 406 U.S. 206, 218) (1972) (threat of five-dollar criminal fine constitutes substantial burden); *O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 426 (2006) (noting the government conceded that the threat of prosecution would constitute a substantial burden).

## CONCLUSION

In this case, before this Court, Ms. Ortega is not asking the government to cease its construction activities. (In fact, the government has already done so, the orders to undertake the construction having been found unlawful and the president who issued them having been voted out of office; *see Sierra Club v. Trump,* 963 F.3d 874 (9th Cir. 2020) (vacated and remanded by *Biden v. Sierra Club,* __ S.Ct. __, 2021 WL 2742775 (July 2, 2021)). She is asking only that she not be punished criminally for her religious activities. That is a small request, and an entirely appropriate one given Congress's insistence that the exercise of religion be strongly protected and the government's long history of ignoring the rights and fundamental humanity of the people who lived on this continent long before the arrival of European colonists. RFRA protect not only the religions white settlers brought with them across the oceans; it protects the religious and spiritual practices of the people who were already here, among them, defending the land. Let us not be the country that runs roughshod over the lives, lands, and spiritual practices of any people who happen to be in our way and then punishes them[4] for resisting.

---

[4] Ms. Ortega has already suffered significantly as a result of these charges. For these petty offenses, she was transported from near the border to a Core Civic immigration detention

Respectfully submitted this 8th day of December, 2021

/s/ Amy P. Knight

Amy P. Knight
3849 E Broadway Blvd #288
Tucson, AZ 85716

Attorney for Amber Ortega

CERTIFICATE OF SERVICE

I certify that on December 8, 2021, I electronically transmitted a PDF version of

this document to the Clerk of Court using the CM/ECF System for filing and for

transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

VINCENT J. SOTTOSANTI
Assistant U.S. Attorney
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: vincent.sottosanti@usdoj.gov

_____

facility in Florence, Arizona, detained for two days without charges during the peak of the
COVID-19 pandemic, and released under conditions of release that have interrupted her
work, health, and emotional wellbeing.