UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America, )
)
Plaintiff, )
)
vs. ) 4:20-mj-08904-N/A-LAB-1
)
Amber Ortega, )
) Tucson, Arizona
Defendant. ) January 19, 2022
_______________________________) 11:12 a.m.

TRANSCRIPT OF PROCEEDINGS
MOTION HEARING
BEFORE THE HONORABLE LESLIE A. BOWMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:
Mr. Vincent J. Sottosanti
U.S. Attorney's Office
405 West Congress Street, Suite 4800
Tucson, AZ 85701

For the Defendant:
Ms. Amy P. Knight
Knight Law Firm, LLC
3849 East Broadway Boulevard, Suite 288
Tucson, AZ 85716

Transcribed by:
Aaron H. LaDuke
405 W. Congress St., Suite 1500
Tucson, Arizona 85701
(520) 205-4264

Proceedings were digitally recorded
Transcript prepared by transcriptionist

P R O C E E D I N G S

(Call to order of court, 11:12 a.m.)

THE CLERK: In the matter of the United States of America versus Amber Ortega, Case No. MJ-20-8904. This is the time set for a motion hearing.

Counsel, state your appearances.

MR. SOTTOSANTI: Good morning, Your Honor. Vince Sottosanti on behalf of the United States.

THE COURT: Thank you. Good morning.

MS. KNIGHT: Good morning, Your Honor. Amy Knight representing Amber Ortega, who is present with me today.

THE COURT: All right. Thank you. Good morning.

Good morning, Ms. Ortega.

THE DEFENDANT: Good morning.

THE COURT: This is the time that I set on the calendar for the defense motion to reconsider the order. Basically, it was the order granting in part the motion in limine. And I have, of course, reviewed the motion and the government's response.

Would you like to be heard, Ms. Knight?

MS. KNIGHT: I would, Your Honor, if that's all right.

THE COURT: Of course.

MS. KNIGHT: I just have a few things to say to clear this up. I know it's a complicated statute that applies in

different ways, in different contexts, and the statute itself doesn't give us a lot of guidance about that. So it's a tricky thing, and I just thought it would be better to address that now than up and down and all this, so here we are.

I think there was a lot of discussion in prior briefing and in the order about the *Navajo Nation* case. I think the easiest way to understand what I want to say here is to compare to that. So that's a civil case, right, in which the tribe, as plaintiff, is trying to stop the government from doing a project that it was doing. This is a criminal case, where the government is prosecuting an individual for something that they were doing, so it's just a very different context.

And when you have -- in the *Navajo Nation* type of case, it's sort of a given that we're talking about an exercise of religion, and the question is, is the government making a substantial burden. In a criminal case like this, it's kind of flipped because the prosecution is inherently a threat of sanction, right? So that's a substantial burden.

The question really, in the first stage of RFRA, is are we talking about an exercise of religion. And it will be a single past occasion rather than trying to figure out as a blanket rule in the abstract, and that single occasion will be the specific acts with which the defendant is charged.

And we have two specific charges here. One of them is

for violating the closure order, essentially entering the closed area. The other is for disobeying an order, essentially refusing to leave the closed area. I know that one of those regulations has a title that says interfering with agency function, but that's not the subsection that she's charged with. It's just entering and then disobeying the order to leave.

I also just want to clarify that we're talking about one defendant, Amber Ortega. I know that there were two defendants originally in separate cases from the same incident, but their actions were somewhat different, so I want to make sure that we're keeping clear evidence that's presented regarding Ms. Ortega and not regarding anybody else.

So the question then that we have here, I think, is was her entering that particular closed area and insisting on remaining there an exercise of her religion. That needs to be understood in the context of the religion a little more broadly. And I know we got some good testimony about that in November, but this is not a culture and a religion that can just be practiced anywhere. It's very tied to specific land, to the earth under your feet that you stand on, that your ancestors stood on, and it's very place-specific. So in the context of that, you can see how the act of defending that land is a part of the religious exercise.

So, yes, of course, prayer and ceremony at Quitobaquito,

the sacred site there with the cemetery and everything, is an important part of their religion, but defending that sacred site from destruction is also an act, an exercise of religion.

And we had some good testimony about that too in November. Just to point out for Your Honor where that came up on the transcript, at 45 and 46, she was going to Quitobaquito to attend ceremony, to camp, to pray, to run, to offer prayers for what was happening, to ask for guidance due to the destruction that was heading toward the spring. "There was a call. It felt like a spiritual call from our elders, from the land, from our ancestors that reside at the spring."

Then on 49, she testified, "it was without hesitation that we needed to protect the land from being desecrated without cultural monitors present. The land holds our historic, our history."

So there we have her saying her physical presence at the site of destruction was a call from her ancestors and her religion. It's not, it's not that she has to successfully stop the construction. It was that she has to be there as a monitor and defender.

And then finally on 52, she's asked, "When did you first become aware that Border Patrol and Park Service officers had come to the area?" Answer: "Their presence was not my concern. The land was my concern. I prayed and sang as much as I could, even when they attempted to speak. They did

arrive at one point. And I was explaining to them and their cameras who I was, as a Tohono O'odham member, as a Hia Ced O'odham, what the land meant, what my presence, who I was, and what that presence meant to my people."

So this is about her presence in that area where the destruction is happening, and she's gone there as a -- you know, on behalf of her ancestors through this call that she testified about.

Now, so I think that helps us to understand, when we're looking at a RFRA offense, we're looking at an exercise of religious belief that is being substantially burdened. The exercise of religious belief here is entering this area and being present for that, and we're looking at those acts in particular among what else may have been done that day because that's what she's charged with.

When we look at substantial burden, I think it's relatively straightforward in a criminal case because the burden is the prosecution. And that doesn't mean that the defendant always wins, because they have to show that their acts were in fact an exercise of religion. It's just sort of shifted around a little from how it comes up in a civil case.

The government, in their briefing, had a couple of suggestions about why there was not a substantial burden here, that she was able to protest in other ways, she could have filed a lawsuit or something or that she could do this

somewhere else. I would dispute those things as a factual matter. But more importantly, the existence of alternatives is legally irrelevant in a RFRA analysis.

And we get this from the U.S. Supreme Court in the *Holt v. Hobbs* case. That's the one where the prisoner of Muslim faith wanted to grow a beard, and the government in that case said, well, we've given him a prayer rug and he's allowed to talk to his imam and he has food, so we're not burdening. And the court said, no, it doesn't matter, right, he can do it other ways. If this thing that he wants to do is an exercise of his religion, they can't do that, right? So I'm hearing exactly the same argument from the government here, and the Supreme Court has already given us the answer to that.

And then, of course, we still don't have the sort of get-out-of-jail-free problem that I think they were worried about because we still have district scrutiny, right? We still have the ability for the government to carry on and do something anyway if they really need to, right? And that's why we have that second part of the RFRA analysis in there. That then becomes the government's burden to establish a compelling interest.

And about that, it's not just that they have to identify an interest that would qualify as compelling; they have to identify an interest where applying this burden to this person in this situation actually furthers that interest. And we get

that from the Ninth Circuit case *Christie*. I know that's cited in the briefing to some extent, *United States versus Christie*, and this is at 1056 and 1057. "We must look beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize the asserted harm of granting specific exemptions to particular religious claimants. The compelling-interest determination is not to be made in the abstract, but in the circumstances of this case."

So, you know, we can say safety is a compelling interest, and I think, you know, that's not really debatable. But the question here would be is enforcing this regulation against Amber Ortega for this September 2020 action furthering safety, is it actually accomplishing that.

And just to sort of clarify that we do really need to analyze that rigorously and say is this actually doing any good in this context, that is analyzed also in the other famous Supreme Court RFRA case. That's the *UDV* case, the *O Centro Espirita*, where they were trying to use the hoasca. And in that case, in the district court, the government had said, well, this is a dangerous substance, so we're keeping safe the people who want to use it because it's dangerous; and the district court said they hadn't proven that. It's their burden. There was some evidence of that but not enough. It wasn't proven that it was actually furthering that interest,

compelling though it may be, and that was left undisturbed in the ultimate resolution in the Supreme Court.

The government identified primarily safety as a compelling interest here. They also then brought up its ability to use its own land and to continue unimpeded with its construction activity. And I think, you know, the problem here is that the record shows evidence of why there was a closure order. That's the general level, but it shows no evidence of specific danger being created by Ms. Ortega being there. There was no testimony about that. And in terms of the video that was admitted -- that was Exhibit 10 -- the entire time that we can see her in the video, she is off on the side of the road. She is not in the way of any equipment. So the evidence just wasn't there that there was actually any advancement of that interest by throwing her out of the area altogether.

One other thing I wanted to mention about the compelling interest is that the government had also suggested because the regulation allowing for closure requires there to be a health and safety reason for doing it, that sort of answers the question. And I just wanted to mention that all of those regulations about when you can and can't close were suspended by DHS for the border wall construction, so that regulation also requires publication in the federal register. They didn't do that, so the regulations are sort of out the window

in terms of what they require the government to do.

If we did find that removing her and enforcing this regulation against her was furthering an interest, a compelling interest -- and I don't believe it was for the reasons I just articulated -- the government would still have to explain why it couldn't advance those same interests without burdening her religious exercise so much. And again we have the Ninth Circuit case *Christie* telling us that they have to at least address any specific alternatives that they become aware of.

One issue that the government brought up was this sort of slippery slope deterrence thing, where if we do this exception, then it's going to happen again, and so we kind of can't do it that way. Again, we have the U.S. Supreme Court explicitly rejecting that line of argument in that *UDV O Centro* case. "The government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to rules of general applicability. Congress determined that the legislated test is a workable test for striking sensible balances." So that just doesn't do it in terms of saying: We can't do it an easier way.

And then I think I might have inadvertently created a

little confusion in the briefing by talking about whether they could actually remove her from the area and then not prosecute her. I don't think we actually have to get that far. That could potentially be a solution that would be less burdensome. But, much more simply, they could have let her stay in that area as long as she didn't get in the way of construction equipment. If they were worried that she was going to be injured somehow, they could have given her a hard hat and a safety vest. There's just no reason why they had to throw her out of the entire area, where she needed to be doing this monitoring and witnessing and defending, in order to keep people safe and go on with their construction.

Finally, in terms of alternatives, they could have stopped the construction. And I realize that would be a controversial place to go in an order on this, but the government did in fact stop, which to me suggests that it was feasible. Again, I think we can get there just on they could have let her stay nearby as long as she wasn't in the path of the equipment.

So that's what I pretty much wanted to present today, to just clarify that I think we might have missed that first step of identifying the exercise of religion being the acts that she is being prosecuted for. Once we do that, I think we have a prima facie case, and we have to get the government to present their substantial compelling interest and least

restrictive means evidence. I don't think that evidence is in the record, so I don't think they get the exception, and I think that the religious freedom defense therefore requires a not guilty.

I know I said a lot of citations and quotations and things. If Your Honor would like to have more briefing on it, I would be happy to submit it. Proposed findings, anything like that, I would be happy to.

THE COURT: Thank you. You know, I just wanted to back you up one step because I think there is something even a little more basic that the government is arguing, which is that I shouldn't even grant the motion for reconsideration, that I shouldn't even let you argue any of this. And so I wanted to give you the chance to address the idea of the manifest error, and I think you did address what may have been overlooked or misapprehended, but I wanted to give you a chance to connect that to manifest error.

MS. KNIGHT: Sure. And I think from reading the briefing, I think there is agreement that you do have discretion here to grant this. The standard, there is a case that I think it was Judge Bury had that explains this pretty well. "Motions to reconsider are appropriate where the court has patently misunderstood a party or has made an error not of reasoning but of apprehension."

And I think that's exactly what we have here, right?

It's not -- we're not saying that there was an error in the analysis. We're saying that there was a misapprehension of what the exercise of religion being put forth was. And then the analysis may have been a very good one if that were -- if this were that case, but it isn't. And just as a practical matter, if it goes forward with this order and there's a conviction, which seemed likely because that was the primary defense, we're going to be back on appeal, and I don't think that benefits anybody.

THE COURT: Thank you very much.

MS. KNIGHT: Thank you.

THE COURT: Mr. Sottosanti.

MR. SOTTOSANTI: Your Honor, yeah. As a preliminary matter, I mean, I feel like I'm here a second time making the same arguments I did the last time we were before this Court on this motion. I mean, the defense arguments, while they've shifted a little bit, it's essentially the same argument, going through the application of RFRA to the facts of this case. There aren't any new facts. There's no new evidence. There's no new law. The Court is familiar with RFRA. The parties have briefed RFRA.

So a preliminary matter, I don't believe that this motion brings up anything new. I'm happy to argue the motion. It's the same arguments I've made in the past, and I can go through them one by one. I can address specific things that the

defense has brought up in this case now. But as a preliminary issue, I would ask the Court just dismiss the motion based on the fact that we've argued it, this would be the second time now.

As far as the specifics of the defendant's motion, the first thing I would like to address is, you know, what are the alternatives in this case. I don't think letting the defendant stay there and doing the construction around her is an alternative. I don't have any expertise in construction or, you know, construction safety. I don't believe, you know, that our job as lawyers is to substitute what we know of construction activities and whether or not they're safe or who is safe to be there. I don't think as lawyers we should be substituting our judgment for the people that are actually, you know, in charge of making sure that construction sites are safe for the public and for the community.

I don't know if letting her having a hard hat and standing on the side of the road is safe or not. I can tell the Court that the person, the superintendent of the park who was granted the authority by Congress to make these public safety decisions, that he issued the closure order based on the fact that, no, he did not believe it was safe for the public to be interacting on the road when there is heavy construction equipment and machinery going by.

So I ask that the Court not substitute its judgment for

the individual assigned by Congress to make these decisions and to find, as I think the evidence has shown, that this was a dangerous situation for everybody involved, for Ms. Ortega, for Ms. David, and all the -- and the other people present during this time.

The second alternative is that she could have -- we could have -- you know, the government, in this case the park rangers, could have just left her here and let her stop the construction for as long as she wanted to stay there. I don't think RFRA contemplates allowing a criminal defendant to put an affirmative burden on the government to either do something or to not do something, in this case to not do construction.

The RFRA cases that we've seen involve things like narcotics or substances used in religious activities and other things like the defendant has pointed out, allowing someone to grow a beard, right, things that don't take affirmative action on behalf of the government. You know, RFRA doesn't say that the government has to supply somebody with the marijuana, right, or the government has to provide beard grooming tools to the individual. What the defense is asking this Court to do is to say that the government now has an affirmative, you know, duty to, A, make -- you know, to stop doing what it's been authorized to do and to wait until the defendant has finished whatever she was doing to then start up again. But I'm not even sure we have to get there.

I would like to go back to the substantial burden part. I don't think we get there because I don't think anything the government has done in this case has put a substantial burden on the defendant's exercise of her religion. This was a closed area. It was closed to the public. I understand that the argument is that the religious requirements of the defendant required her to try and stop or to protest the construction that was happening there, but she's not charged with protesting outside of time, place, or manner restrictions that have been set by the government, which, of course, the government is allowed to set time, place, and manner restrictions, you know, on protests under the First Amendment. But that's not what happened in this case. She's charged with entering a closed area in violation of a closed order that was -- a closure order closing the area to the public.

I don't see any testimony about how violating closure orders or the government instituting closure orders for public safety can substantially burden one's religion. As we put in the motion, she's free to practice that religion other places. She's free to go protest border wall construction outside of the area that was subject to the closure order. In fact, the closure order was applicable to Border Road. She could have easily stayed even, you know, 40 yards away from the area that was closed and protested. She was arrested because she entered the road in violation of the closure order and blocked

construction equipment and put herself and others at risk.

If the Court will recall, and it's part of the record, the map of the area that was closed is a narrow strip of land that essentially just covers the West Border Road. Quitobaquito Springs was not subject to the closure order at the time. And even if the Judge, the Court does find that, you know, preventing her from entering this closed area is a substantial burden, then, you know, we move on to whether or not the government has a compelling interest and has used the least restrictive means of enforcing the closure order.

I've already talked about the public safety issues, and really that's the compelling interest in this case, public safety issues. And then the government also has a compelling interest in being able to institute its policies, you know, whether it's construction, whether it's, you know, any other type of land improvement, right? The government has an interest in making sure these things are done.

And we used -- so the second part of that is, one, I think we've established a compelling interest. The second thing is whether or not we used the least restrictive means of enforcing the closure order, and that goes back to safety. I mean, aside from the arguments that have already been made, you know, whether or not we could have left her there, which I don't think is reasonable, or whether we could have let her, you know, stay there indefinitely until, you know, she decided

to leave so the construction could have been picked up again, I don't think either one of those is reasonable.

Really, you know, once the defendant blocked traffic and then refused to leave after being asked to do so, she left the government in a situation with no choice. The park rangers at the time tried to give her the option of just leaving. Really, arresting her was a last resort. They didn't have any choice. The choice was either have the construction workers and everybody else, you know, stand around waiting for her to voluntarily, you know, exit the road, or arrest her, because I think we've already established that they can't just do the construction around her. It's just not safe.

So, really, arresting her was the last resort, it was the least restrictive means, and I think the defendant's RFRA argument fails. If the Court finds that, you know, there was a substantial burden, then it doesn't make it past the second step in the analysis.

Now, you know, pending any specific questions from the Court, I feel like, you know, now I've done what I said I didn't want to do, which is argue this whole thing again that I've already argued, but, you know, that's the situation that we're in. So unless the Court has any specific questions, I think I'm done.

THE COURT: All right. Thank you very much.

MR. SOTTOSANTI: Thank you.

THE COURT: Any reply from the defense?

MS. KNIGHT: Just a couple of things that I wanted to mention that I heard there.

In talking about the alternatives and the question of why couldn't she just stay in the area as long as she wasn't in the way, what I just heard him say is: I don't know if she can or not; I don't know if that's safe or not; I'm not the expert; I don't know. And at this stage, it's their burden to prove it, right? They could bring somebody who does know. They could have asked the witness that they had here, the ranger, whether that was safe or not, whether that was possible. They didn't do it, right? So if they don't know if it's safe or not, they have not met their burden there.

I also heard a lot of explanation of the general reason why we had to have the closure. The superintendent says it has to be closed so it can be safe. That's not the level that we have to analyze things in RFRA. We have to ask is enforcing it against her making it safe, and again I didn't hear any evidence of that.

Toward the end I heard him say, once she started blocking the traffic, we had no other choice. There was no evidence that she was blocking traffic. You have the park ranger, Ranger Kois, I believe it was, comes in and says, when I got there, she was off on the side of the road near the border. When you see the video, she is off on the side. At the point

when she's actually being arrested, she is behind the guardrail. So I'm just -- this last resort thing is just not borne out by the record, and I think we might be getting some creep from the other defendant who was present, who is not on trial here.

Finally, the idea that RFRA doesn't require the government to sort of affirmatively do anything, I think that's exactly what it requires. It requires the government to accommodate somebody's exercise of religion if it can, and in some cases that takes a much more passive form of simply allowing something. In other cases, they may have to bend over a little further backwards to accommodate that. But Congress says that they have to do it if they can, basically.

So I think finally there is just still not maybe quite a full grasp of what the asserted exercise of religion is here from the government, right? She couldn't protest somewhere else because this is where it was happening. And in her scheme of things, place is very important, right? Other forms of protest, I'm not sure what basis they could possibly have for saying that another form of protest would satisfy her religious needs. It's not in the record, and I just don't know where that's coming from.

They've conceived of it as just she has to protest. That's not it. She has to go to this specific place where the construction equipment is moving in. And that's why it's

closed, right, because that's where the equipment is, so she can't just go to someplace that's not closed. If it's not closed, it's probably not where it's happening. RFRA allows her to do something that is otherwise illegal if it's an exercise of her religion and the government has the capacity to allow her to do it, her personally.

So that's where we are, and I would gladly answer any more questions.

THE COURT: All right. Thank you.

MR. SOTTOSANTI: Judge, can I have a brief response?

THE COURT: Of course.

MR. SOTTOSANTI: Yeah, yeah. I just wanted to point out that I went and I looked through the transcript, and I do think there's evidence that she actually, that Ms. Ortega actually blocked traffic. In fact, I think her attorney at the time asked her if she had stopped some construction equipment, and she did admit to having stopped some equipment. I believe that's in the transcript. I don't have a citation for the Court, but I can provide it after the hearing.

And the other thing I would like to point out is that, you know, this isn't the venue for challenging the closure order. The government followed the regulations in place for issuing of a closure order, the requirements that the superintendent make specific findings. You know, if this was a civil suit challenging the closure order, then we could

bring, you know, whatever experts the superintendent relied on to that. We're not prepared, of course, because this is, this is a criminal case for what is essentially a trespass charge and it wasn't a challenge to the closure order itself.

And finally, I just want to point out generally that the RFRA cases in general essentially show RFRA as a shield against, you know, government action. And this is a case of the defendant using RFRA essentially as a sword to stop the government from doing something, not just to protect herself from government action but to prevent the government from doing something that had, at the time it was implemented, nothing to do with Ms. Ortega and that's the border infrastructure improvement.

So, you know, I think that there is a little bit of confusion here about what RFRA, what affirmative burdens RFRA allows a person to put on the government. I think in those cases it's that it's a shield against, you know, having rules applied to you, having laws applied to you and grant you an exception to those laws, versus it allows a person to then go and veto government activity that they don't agree with.

That's all. Thank you.

THE COURT: Thank you very much. All right.

MR. SOTTOSANTI: Oh, and, Judge, one other thing. I want to bring this up because I know the Court is going to make a ruling on this RFRA motion and then is going to start

thinking about a verdict in this case. This doesn't have anything to do with the motion.

The defense sent me a formal request for disclosure a couple of weeks ago. I received that request. She asked for some things that weren't discussed previously with me and the former attorney on the case. So I have some of these items. They're like radio logs and audio recordings of the radio, which I'm going to provide to the defense.

There was also -- I found out after receiving the defense's request for additional disclosure, I found out that there was a video taken by one of the Border Patrol officers on a Border Patrol-issued cell phone. We don't have that video. We are still looking for it. But at this point, I'm not sure that they retained a copy of it. My office doesn't have a copy of it.

So I just wanted to let the Court know that there was an outstanding disclosure issue and that we're working with the defense diligently to make sure she's got everything that she needs going forward.

THE COURT: Okay. Thank you. I appreciate that. Thank you for that record.

The Court is going to grant the motion to reconsider its order on the motion in limine, and that is based on matters that were overlooked or misapprehended by the Court; and the Court finds that those matters did, in fact, lead to the Court

making manifest error in the Court's order.

I am going to deny the motion in limine. I am going to consider the evidence that was brought in through Lorraine Eiler's testimony and also Ms. Ortega's testimony. In light of that new evidence, the Court finds that the prosecution of Ms. Ortega did impose a substantial burden on her, on the exercise of her religion. The government has not proven or demonstrated a compelling government interest nor that it used the least restrictive means possible even if there were a compelling government interest. All of that being said, the Court finds that Ms. Ortega is not guilty.

MR. SOTTOSANTI: Thank you, Your Honor. May I be excused?

THE COURT: Thank you.

MR. SOTTOSANTI: Thank you.

(Court recessed at 11:53 a.m.)

C E R T I F I C A T E

I, Aaron H. LaDuke, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter to the best of my ability.

Dated this 3rd day of February, 2022.

s/Aaron H. LaDuke
Aaron H. LaDuke, RMR, CRR